FILED
2012 Apr-10  AM 09:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| BRANDY A. ANDAZOLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-10-S-316-NW |
| | ) | |
| LOGAN'S ROADHOUSE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

If the regional manager of a national food chain directs the manager of a restaurant under his supervision to hand over her keys to the workplace,[1] and advises her "to quit because [she is] about to be fired,"[2] is that equivalent to actually saying "you are fired"?  The plaintiff contends that it is, while defendant construes plaintiff's submission of a letter of resignation the morning after such a conference as a voluntary act that does not give rise to an action under federal employment discrimination statutes seeking damages for "termination" of employment.

The factual scenario sketched in the preceding paragraph presents the most interesting question raised in this case:  an action in which plaintiff alleges that her

---

[1] *See* doc. no. 23-2 (Plaintiff's Deposition), at 198 (stating that defendant's Regional Manager, David Rodriguez, said "I need your keys").

[2] *Id*. at 168-69 (alteration supplied) (speaking of the day that defendant's Regional Manager took her keys, and testifying that "I was advised to quit because I was about to be fired").

former employer violated Title VII of the Civil Rights Act of 1964 by twice failing to promote her to a General Manager position because of her sex,[3] and by subsequently terminating her employment — either because of plaintiff's gender,[4] or in retaliation for her complaints about gender discrimination and sexual harassment in the workplace.[5] Plaintiff also alleges that defendant violated the Equal Pay Act of 1963 (and, arguably, Title VII) by paying her less than a similarly-situated male employee.[6] In addition to those federal claims, plaintiff invokes this court's supplemental jurisdiction,[7] and alleges that defendant violated state laws by condoning sexual harassment, failing to properly respond to complaints of sexual harassment, and making false, harmful statements about plaintiff.[8]

---

[3] *See* doc. no. 1 (Complaint) ¶ 27, at 6 (Count One, providing in pertinent part that "Andazola's membership in a protected class . . . was a motivating factor in Logan's decision to pay male employees more than female employees such as Andazola, to promote male employees instead of female employees such as Andazola, and to discipline and reprimand female employees such as Andazola when they did not discipline and reprimand male employees for the alleged same type thing or behavior."). Title VII of the Civil Rights Act of 1964, as amended, is codified at 42 U.S.C. § 2000e *et seq.*

[4] *Id.*

[5] *Id.* ¶¶ 37-43, at 7-8 (Count Three).

[6] *Id.* ¶¶ 30-36, at 7-8 (Count Two, pertaining to plaintiff's claims under the Equal Pay Act). The Equal Pay Act is codified at 29 U.S.C. § 206(d).

[7] *Id.* ¶ 3 ("Andazola's claims arising under the laws of the State of Alabama are properly before this Court pursuant to 28 U.S.C. §1367, supplemental jurisdiction.").

[8] *See* Complaint ¶¶ 44-67, at 9-16 (asserting state law claims for intentional infliction of emotional distress, negligent hiring, training, supervision, and retention, defamation, and invasion of privacy).

This opinion addresses defendant's motion for summary judgment;[9] and, upon consideration of that motion, the parties' briefs and evidentiary submissions, and the oral arguments of counsel, this court concludes that defendant's motion is due to be granted on most of plaintiff's claims, but denied as to two.

## I. SUMMARY JUDGMENT PRINCIPLES

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[10]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "A genuine issue of material fact 'exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.'"  *Farley v.*

---

[9] *See* doc. no. 22 (Motion for Summary Judgment).

[10] Rule 56 was amended, effective December 1, 2010, in conjunction with a general revision of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.) (emphasis supplied). Consequently, cases interpreting the language of Rule 56 prior to the 2010 amendments are equally applicable to the revised version.

3

*Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (quoting

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284-85 (11th Cir.

1997)).

"In making this determination, the court must review all evidence and make all

reasonable inferences in favor of the party opposing summary judgment." *Chapman*

*v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.*

*City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "[A]n inference is not reasonable

if it is only a guess or a possibility, for such an inference is not based on the evidence,

but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692

F.2d 1321, 1324 (11th Cir. 1983). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is material to an issue affecting the
> outcome of the case. The relevant rules of substantive law dictate the
> materiality of a disputed fact. A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921); s*ee also Anderson v.*

*Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (stating that the determinative

question is "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law").

4

## II.  SUMMARY OF FACTS

The defendant, Logan's Roadhouse, Inc., is headquartered in Nashville, Tennessee, and the company operates more than 180 company-owned "Logan's Roadhouse"™ restaurants in twenty-three states, including Logan's Roadhouse #312 in Florence, Alabama, as well as *supervising* the operations of 26 franchisee-owned restaurants serving moderately-priced food under that same tradename.[11]  Defendant hired plaintiff, Brandy A. Andazola, to be the Bar Manager of the Florence, Alabama restaurant on September 9, 2004.[12] Within the hierarchy of defendant's restaurants, positions such as "Bar Manager," "Kitchen Manager," "Dining Room Manager," and "Front of the House Manager" are classified as "assistant manager" posts, below the level (and supervision) of an "Assistant General Manager" and a "General Manager."[13]  Plaintiff's employment ended on August 26, 2008, just short of the fourth anniversary of her hire date, under circumstances that will be discussed in detail in Part II(E), *infra*.

---

[11] *See* www.logansroadhouse.com/all_about_us; doc. no. 23 (Brief in Support of Summary Judgement), at 1.

[12] *See* doc. no. 23-2 (Plaintiff's Deposition), at 102 ("I was originally hired as a Bar Manager."), 116-118 (discussing Sept. 9, 2004 written offer of employment).

[13] *Id*. at 101, 112-113 (confirming that her Bar Manager position "was an Assistant Manager position"). Plaintiff testified that she "was awarded the position and title of AGM [Assistant General Manager] on my last evaluation, *which would have been September of 2009 . . . .*" *Id*. at 187 (emphasis supplied).  In view of the fact that plaintiff's last day of employment with defendant was August 26, 200**8**, however, *see id.* at 168-69, her deposition testimony obviously is not correct.

**A**.    **Plaintiff's Complaints About Sexual Harassment in the Workplace**

Plaintiff alleges that she lodged complaints about the conduct of two employees, Peter Austin and Thomas Moody, that she perceived as sexual harassment. *Peter Austin* was the "Kitchen Manager" of Roadhouse #312.[14]  During the time that plaintiff worked with Austin, he was undergoing a trans-gender sex-change.[15]  During the conversion, "his" behavior became increasingly bizarre.  For example, one night in 2007, Austin removed his "breast" from his shirt and, in plaintiff's presence, "squirted milk" across the bar.[16]  That same evening, he tried to kiss a fellow employee.[17]  On another occasion in 2007, Austin asked plaintiff — who apparently did not adhere to traditional female gender roles[18] — to kiss him, and to touch his "breasts."[19]  Austin also had a "temper."[20]  He yelled at plaintiff and other employees, and threw plates, tongs, knives, glasses, and sauté pans without concern

---

[14] *See id.* at 225-27; doc. no. 23-5 (Rodriguez Deposition), at 20-21.  Austin is pictured in the center of the group of persons in the photograph identified as doc. no. 39-3 (bottom photograph). Plaintiff's Depo. at 291.

[15] Plaintiff's Depo. at 233.

[16] *Id.* at 233-34.

[17] *Id*. at 234.

[18] *See, e.g., id*. at 80-82 (plaintiff testified that she had been in a relationship with Jessica Stoltz); doc. no. 23-5 (Rodriguez Deposition), at 180-81 (stating that plaintiff "was a lesbian"); doc. no. 23-4 (complaint mailed by Thomas Moody to defendant's corporate headquarters), at 64 ("Being male I am of no interest to Brandy in a sexual nature . . . .").

[19] Doc. no. 23-2 (Plaintiff's Deposition), at 257.

[20] *Id.* at 228-32.

for whom or what the objects might strike.[21]   When plaintiff or other employees organized areas of the restaurant, Austin came behind them and changed everything they had done.[22]   Plaintiff says that she complained to David Rodriguez, defendant's "Regional Manager" of the geographic area that encompassed Logan's Roadhouse #312,[23] about Austin's behavior on three occasions:  the first time during May of 2008, and then again in July and on August 25th of the same year,[24] but Rodriguez denied that she did so.[25]   She also says that she complained to Jim Edwards,[26] who was the General Manager of Roadhouse #312 until the end of July 2008.[27]   She says that she told Edwards that Austin was "harassing" other employees, and that he singled out women for his "harassment,"[28] but Edwards took no corrective action.

---

[21] *Id.*

[22] *Id.* at 228-32.

[23] Rodriguez supervised two Logan's Roadhouse restaurants located in Alabama (Decatur and Florence), one in Arkansas (Conway), two in Memphis, Tennessee; and, an unspecified number in Mississippi.  *See* Rodriguez Depo. at 8-11; *see also* doc. no. 23-1 (Declaration of David Rodriguez) ¶ 4 (emphasis supplied).  Rodriguez's direct supervisor was Jim Kuehnhold, whose office was in defendant's Nashville corporate headquarters.  Rodriguez Depo. at 57.

[24] Plaintiff's Depo. at 208, 219, 231-43.  As discussed hereafter, in Part II(E), Aug. 25, 2008 was the date on which plaintiff contends that she was "fired."

[25] *See* Rodriguez Depo. at 72 (denying that plaintiff told him about Austin "pulling his shirt off at the bar at Logan's"), 86-87 (testifying that plaintiff "is not telling the truth" when asserting that she asked him to investigate her allegations that Peter Austin sexually harassed her, and that he "never received a complaint" from plaintiff, or from anyone else for that matter, accusing either Peter Austin or Thomas Moody of sexual harassment).

[26] Plaintiff's Depo. at 237-38.  There is no evidence in the record establishing the date on which plaintiff allegedly complained to Edwards.

[27] *Id.* at 208 (testifying that Edwards "left the end of July").

[28] *Id.* at 238, 245

*Thomas Moody* was the second employee about whom plaintiff complained. He was an hourly-wage employee in the Florence Roadhouse who initially was hired as a server, but later had bartender functions added to his serving duties.[29] According to plaintiff, he told sexual jokes, uttered gender slurs, and made offensive hand motions in the presence of female employees.[30] He also touched female employees in an inappropriate manner, ran his hands through their hair, and grabbed their buttocks.[31] Plaintiff assisted another restaurant employee, Ginger Thompson, to lodge a written complaint against Moody on some date that is not clearly stated in the evidentiary materials presented to this court, but which would have occurred sometime prior to Thompson's last date of employment in September of 2006.[32] Plaintiff delivered Thompson's complaint to Paul Tompkins, who then was General Manager of the Florence Roadhouse, and he said that "he would let Jim Edwards handle it since . . . Thomas Moody and Jim Edwards were . . . very close friends."[33]

---

[29] Rodriguez Depo. at 17-20, 40.  Moody is depicted in the photograph identified as doc. no. 39-4.  Plaintiff's Depo. at 292.

[30] Plaintiff's Depo. at 258; doc. no. 38-2 (Declaration of Ginger Thompson), at 1.

[31] Plaintiff's Depo. at 366.

[32] *See* Thompson Declaration at 1 (stating that "I worked at Logan's Roadhouse in Florence, Alabama from approximately December 2005 to approximately September 2006"); *id*. at 2 (stating that plaintiff assisted Thompson in filing a formal written complaint about Moody's sexual harassment).

[33] Plaintiff's Depo. at 356-58.

Afterwards, Moody's behavior improved.[34]

## B.     Company   Policies   Against   Discrimination,   Harassment,   and Fraternization

It is not disputed that defendant prohibited discrimination, harassment, and retaliation in the workplace, and provided several mechanisms for employees to report any alleged incidents of such misconduct.[35]   The following statements are copied from the defendant's "Restaurant Management Handbook."[36]

### EQUAL EMPLOYMENT OPPORTUNITY

\* \* \* \*

Logan's will not tolerate any form of discrimination, harassment or retaliation affecting its employees or applicants due to race, color, religion, sex, sexual orientation, national origin, age, marital status, medical condition, or disability.

Employees who believe they have been subjected to unlawful or unfair discrimination, harassment, or retaliation must immediately advise their General Manager or Regional Manager.  In addition, you can always call the **Employee Relations Department toll-free at (800) 815-9056, extension 1225** to report issues or concerns about your employment at Logan's.  You are also strongly encouraged to report inappropriate conduct that you observe, whether or not it affects you directly.

---

[34] Thompson Declaration at 2 ("Mr. Moody's behavior improved for a while after I filed my complaint and after he was talked to about his behavior.").

Plaintiff testified that she also complained on unspecified dates to Regional Manager David Rodriguez about Moody's sexual harassment of female employees, *see* Plaintiff's Depo at 258-59, but he denied that. *See, e.g.*, Rodriguez Depo. at 40-41; *id*. at 87 (testifying that he "never received a complaint" from plaintiff or anyone else accusing Moody of sexual harassment); *id*. at 123-124 (testifying that plaintiff did not testify truthfully when saying that she complained to him about Moody's sexual harassment during the August 25, 2008 conference, just prior to the end of her employment).

[35] *See* Brief in Support of Summary Judgment ¶ 7, at 2 (containing citations to the evidentiary record).

[36] *See* doc. no. 23-4 (Exhibits to Plaintiff's Deposition), at 4-61 ("Logan's Roadhouse, Inc. Restaurant Management Handbook").

The company's anti-discrimination and anti-harassment policies are intended to result in effective responses to problems.  They require you to provide the company an immediate opportunity to investigate and resolve your workplace concerns.  *You must notify your restaurant General Manager, Regional Manager,* or *the Employee Relations Department at the above number regarding issues of harassment, discrimination or retaliation*.  Employees are encouraged to use the chain of communication, *but are not required to notify or speak to restaurant management prior to contacting the Employee Relations Department*.

ANTI-HARASSMENT STATEMENT

At Logan's, we believe that all team members should be treated with courtesy, honesty and respect and should enjoy a work environment free from discrimination and from harassment.  We will not permit harassment or retaliation by managers, team members, guests, or vendors.  We are committed to having a workplace free from harassment or discrimination based on race, color, religion, sex, sexual orientation, national origin, age, marital status, medical condition, or disability.  At Logan's, we consider the following types of conduct to be unacceptable:

- Unwelcome or obscene slurs, jokes, or harassing comments.

- Unwelcome or obscene graffiti, cartoons, drawings or other written comments.

- Unwelcome or obscene sexual advances, repeated unwelcome requests for dates, or requests for sexual favors.

- Unwelcome, obscene or offensive touching or other physical conduct directed at a team member.

- Threatening or requiring a team member to submit to sexual advances in return for an employment benefit.

- Retaliation for having reported possible harassment.

- Threatening or attempting to condition a team member's job status in any way, explicitly or implicitly, upon submission by a team member to harassment of any type.

- Offensive visual contact with sexual overtones, such as leering, gestures, or displaying obscene objects, cartoons, or pictures.

- Offering or exchanging employment benefits for sexual concessions, such as promising a promotion in exchange for sexual favors.

- Threatening withdrawal of benefits for refusal of sexual favors, such as suggesting the individual will receive a poor performance evaluation or a promotion will be withheld unless sexual favors are given.

10

At Logan's we are committed to making sure that team members are not harassed because of their race, color, religion, sex, sexual orientation, national origin, age, marital status, medical condition, or disability.  However, we need your help to make sure we have a workplace free from harassment.  *We need you to tell us immediately if you believe you are being harassed or believe discrimination is occurring within our company.  Do not wait to complain. We need to address these situations as quickly as possible.  The first time you believe improper conduct in violation of this policy has occurred,  you should make your concerns known immediately. You should report any possible harassment to the Employee Relations Manager at the Home Office on our hotline at*:

**(800) 815-9056, ext. 1225.**

*If you have concerns about the Employee Relations Group, you may contact the company's President directly.*

All reports of possible harassment or discrimination will be investigated promptly. We will keep the investigation confidential to the extent that we can under the circumstances.  We encourage team members to report any potential harassment or discrimination.  Team members reporting violations of this policy will not be punished or retaliated against in any way.  However, the company does not condone team members who report violations that have no basis or foundation and may take disciplinary measures if false or malicious claims are reported.

If it is determined that this policy has been violated, corrective action will be taken up to and including immediate separation from employment.  The action to be taken will be determined based on the circumstances of each situation.  If it is determined that this policy has not been violated or that there is not sufficient evidence to conclude that this policy has been violated, this will be communicated to you as the team member making the complaint, along with the reasons for this determination.

* * * *

HOTLINE

Logan's has set up a hotline to deal with claims of discrimination and harassment on the basis of race, color, religion, sex, sexual orientation, national origin, age, marital status, medical condition, or disability.  If you feel that you have been discriminated against or harassed, call the hotline number at (800) 815-9056, ext. 1225 and follow the directions given. This is a private message and will be investigated by Employee Relations. Generally, your call will be returned within 48 hours after your message is received. Team members reporting discrimination or harassment will not be punished or retaliated against in any way.[37]

---

[37] Exhibits to Plaintiff's Deposition at 12-13 and 15 (boldface emphasis in original, italicized emphasis supplied).  David Rodriguez testified consistently with the foregoing material that, in the event plaintiff personally suffered, observed, or learned of acts of sexual harassment, her

Before actually beginning her employment for defendant, plaintiff was required to attend a two-week orientation during which she was trained on defendant's policies and procedures, including those outlined in the foregoing quotations from the defendant's "Restaurant Management Handbook."[38]   Following that, she was a "manager in training" for approximately eight weeks at the company headquarters in Nashville, some at the Logan's Roadhouse in Decatur, Alabama, and finally at Restaurant #312 in Florence.[39]   Plaintiff acknowledged on September 28, 2004 that: she had received a copy of defendant's "Restaurant Management Handbook"; she had read and understood "all of the policies, procedures and practices of Logan's Roadhouse, Inc."; she "had the opportunity to ask questions about Logan's Roadhouse, Inc. policies, procedures and practices"; she had agreed, as a condition of her employment, to abide by those policies, procedures, and practices; and, finally, that her failure to comply with those policies, practices, and procedures "*will result*

---

responsibility was to communicate that information to the General Manager of Restaurant #312, who in turn was responsible for transmitting the information to both the Regional Manager and Employee Relations Department in the company's home office.  *See* doc. no. 23-5 (Deposition of David Rodriguez), at 64-67.

[38] *See* doc. no. 23-3 (Plaintiff's Deposition), at 98-99, 105-109; *see also* doc. no. 23-1 (Declaration of David Rodriguez) ¶ 11 ("During her orientation, Plaintiff received a copy and was trained on Logan's Restaurant Management Handbook, which includes its Equal Employment Opportunity, Anti-Harassment, Open Door, Hotline, Compensation[,] and Dating and Other Relationships policies.").

[39] *See* Plaintiff's Depo. at 110-111.  *See also* Rodriguez Declaration ¶ 3.

in discipline, up to and including separation from employment."[40]

In order to provide a workplace that was "free from actual or perceived conflicts of interest or favoritism caused by dating or other relationships that occur between people in the workplace," defendant also "**expressly prohibited** . . . **management to date or be involved privately with any other managers or team members in their restaurant**"[41] — the so-called anti-fraternization policy.  On the same day that plaintiff acknowledged her receipt of defendant's "Restaurant Management Handbook," she separately acknowledged that she had "received, reviewed, and [understood] the Logan's Roadhouse's [*sic*] policy on Dating and Other Relationships," including her recognition that a breach of those policies "*may result* in discipline, up to and including immediate separation from employment."[42]

Defendant additionally provided "both a 1-800 Hotline and a direct dial extension to report *any compensation and pay issues*."[43]

In response to the uncontested fact that "Plaintiff did not call the corporate

---

[40] Exhibits to Plaintiff's Deposition at 1 (emphasis supplied); *see also* Plaintiff's Depo. at 119-121; Rodriguez Declaration ¶ 11.

[41] Exhibits to Plaintiff's Deposition at 31 (boldface emphasis in original); *see also* Rodriguez Declaration ¶ 10, at 3.

[42] Exhibits to Plaintiff's Deposition at 2 (bracketed alteration and emphasis supplied); *see also* Plaintiff's Depo. at 119-121; Rodriguez Declaration ¶ 12. *Nota bene* defendant's semantic shift from the mandatory phrase "will result" in the last sentence of the preceding paragraph to the precatory "may result" in the present sentence.

[43] Rodriguez Declaration ¶ 8, at 3 (emphasis supplied).

13

Hotline to report any complaints of discrimination, harassment, retaliation, or compensation issues,"[44] plaintiff retorted that Regional Manager David Rodriguez had instructed her to lodge such complaints *only* with him, and *not* to communicate with defendant's corporate headquarters or others.[45]  Rodriguez denied her riposte.[46]

---

[44] *Id*. ¶ 13, at 4 (citation to record omitted).

[45] Plaintiff's Depo. at 260-61 ("I was told specifically . . . by Mr. Rodriguez [that] . . . he wanted any issues directly to go to him so that he could handle it and it not have to go to the corporate office.") (bracketed alteration and ellipses supplied); and at 312-13 ("But, yet, every time I approached Mr. Rodriguez about [Thomas Moody's alleged sexual harassment] he did nothing. He told me to handle it.  But, yet, let's keep things on our level, don't call the corporate office so I can handle them down here.  I want to make sure that I can handle them.") (bracketed alteration supplied).

[46] See, for example, the following exchange from Rodriguez's deposition:

> Q.    Let me ask you this, if Brandy Andazola's testimony is that you told her to report these things to you and not to report to corporate, is she telling the truth or not telling the truth?
>
> * * * *
>
> A.    Not telling the truth.
>
> Q.    Why?
>
> A.    I never made those statements.

Rodriguez Depo. at 70.  In fairness to plaintiff, two points should be noted.  First, to the extent that her complaints narrowly concerned fraternization and other dating relationships, she may have confused her reporting obligations under the following policy statement:  "Any manager who currently or in the future begins a mutually voluntary dating or romantic relationship with an hourly team member *must notify the Regional Manager* within 14 days."  Doc. no. 23-4 (Defendant's Restaurant Management Handbook) at 31 (emphasis supplied).  When that policy statement is carefully read, however, it clearly is best construed as a *self-reporting requirement*, a "safety-valve" that can prevent the discipline or discharge of either the manager or hourly-wage employee, or both. Nevertheless, plaintiff may have misunderstood her obligation under that policy statement and, if she *in fact* lodged *any* complaints with Rodriguez — a "fact" that he disputes — she may have mistakenly reported to him as a result of the quoted statement.  *The second point that must be noted*

14

### C.   Plaintiff's Failure to be Selected for General Manager Positions

Jim Edwards resigned as General Manager of defendant's Florence Roadhouse at the end of July 2008.[47]   At the time, he was under investigation for allegedly allowing (or requiring) hourly-wage employees to work "off the clock."[48]   During the very brief, approximate one-week interval between Edwards's resignation and the selection of his replacement,[49] plaintiff contends that she effectively served as "acting General Manager."[50]   She testified that she asked to be considered for permanent promotion to the position, and that Rodriguez told her she would be considered,[51] but he denied that.[52]   Rodriguez interviewed Hank Luking, then serving as General

---

*in fairness to plaintiff* is that, again, to the extent that her complaints narrowly concerned only fraternization and dating relationships, and if one reviews the full text of the "Dating and Other Relationships" section of defendant's "Restaurant Management Handbook," *supra*, it will be seen that the reporting requirements of other managers and employees, not involved in the prohibited relationship, are not specified.

[47] *See* Plaintiff's Depo. at 208 (testifying that Edwards "left the end of July").

[48] *See* Rodriguez Depo. at 15-16.

[49] Plaintiff's Depo. at 208-09 (testifying that "there was about a week" gap between Edwards's resignation and the selection of his replacement).

[50] Doc. no. 38-1 (Plaintiff's Declaration), at 6.  During her deposition, plaintiff testified that, after Edwards resigned, she was instructed by Rodriguez to ensure that all of the functions of the General Manager at the Florence Roadhouse were carried out until a replacement could be selected — in other words, she effectively was made *acting* General Manager.  *See* Plaintiff's Depo. at 208-09.  Rodriguez testified that he "did not recall having that conversation with her," and denied that he met with plaintiff shortly after Edwards resigned and told her that she was going to be promoted to General Manager of the Florence Roadhouse.  Rodriguez Depo. at 164, 173.

[51] Plaintiff's Depo. at 208-09.

[52] *See* Rodriguez Declaration ¶¶ 5-10, at 2 (stating that, as a result of a complaint received in "June 2008" from the manager of another Florence restaurant about plaintiff's conduct in his restaurant while wearing a shirt that identified her as a Logan's manager, Rodriguez met with

15

Manager of defendant's recently-opened Athens, Alabama Roadhouse, and thereafter

told his corporate superior, Jim Kuehnhold,[53] that

> Luking was interested in coming to Florence.  That's where he began,
> I believe, and his family was there, he owned a home there.  And I felt
> that[,] based upon his experience, he'd recently been GM of the year,
> that he would be a great asset to help correct some of the issues in the
> [Florence] restaurant.[54]

Kuehnhold awarded the position to Luking.[55]

---

plaintiff on or about July 10, 2008, and placed her "on a Final Written Warning for
unprofessionalism"; as a result, when Jim Edwards resigned at the end of that month, Rodriguez "did
not consider [plaintiff] to be qualified for a promotion to General Manager").

[53] Rodriguez Depo. at 169-70.

[54] *Id*. at 170 (bracketed alterations supplied).  *Compare id*. at 169 (where Rodriguez testified
that he never *recommended* either the hiring or termination of employees, but instead "utilize[d] our
home office.  We evaluate the facts and based upon those — the information that we have [— and]
our home office makes those decisions") (alteration supplied), *with* the following passages from
pages 170-71 of Rodriguez's deposition:

Q.    All right.  Did Mr. Kuehnhold honor your *recommendation*?

A.    *Yes*, *sir*.

Q.    And Mr. Luking was employed as the GM at [the] Florence Logan's; is that
correct?

A.    Yes, sir.

Q.    Based upon your recommendation?

A.    Based upon many facts.

Q.    Based upon your recommendation?

A.    That was part of *our decision*.  [Emphasis supplied.]

[55] Doc. no. 23-5 (Deposition of David Rodriguez), at 170-71.

Prior to the selection of Luking as General Manager of the Athens Roadhouse, he had been General Manager of the Logan's restaurant in Decatur, Alabama.[56] When defendant opened the Athens Roadhouse, Luking was transferred from Decatur and made General Manager of the new restaurant.  According to plaintiff, Rodriguez told her that, "in order to be a GM [General Manager] in this company," a person first had to complete the Assistant General Manager "program"; and that, for the first year after the opening of a new restaurant, such as the Athens Roadhouse, company policy only permitted someone who had previously served as a General Manager to manage the facility.[57]  Luking held the Athens position for only three months before being transferred to Florence.[58]

Plaintiff said that, after Hank Luking was made General Manager of Restaurant #312 in Florence, she expressed an interest in being promoted to the Athens General Manager position vacated by his transfer,[59] but the slot was awarded instead to Nykael Stewart, who already was employed in the Athens restaurant in some capacity

---

[56] Doc. no. 23-2 (Plaintiff's Deposition), at 216.

[57] Plaintiff's Depo. at 189, 211-12.  *Compare* Rodriguez Depo. at 161 (affirming that he told plaintiff "Logan's standard is to have current GM's take over that role. . . .  To place existing Logan's Roadhouse General Managers in new restaurant opening"), *with id.* at 196-97 (stating that he "did not recall" telling plaintiff that she would have to complete the Assistant General Manager training program before she could be considered for promotion to General Manager).

[58] Plaintiff's Depo. at 210 ("He was in that store for three months. . . .  He was supposed to stay there the first year because you can't have a new GM in a new store.").

[59] *Id.* at lines 3-4 ("And then that's when I asked about Athens.").

that is not clearly disclosed in this record.[60]  Plaintiff notes that, contrary to David

Rodriguez's alleged representations to her about company policy, Stewart had no

previous experience as a General Manager at any Logan's Roadhouse.[61]  Moreover,

plaintiff touts the fact that she successfully completed defendant's Assistant General

Manager training program in September of 2007,[62] but Stewart *allegedly* had not.[63]

## D.   **The Alleged Gender-Based Wage Disparity**

Plaintiff's starting salary was $37,000 annually.[64]  She received a raise each

year.[65]  When her employment ended, her salary was $45,000 a year.[66]  Plaintiff

complains about the fact that Peter Austin, the Kitchen Manager of Roadhouse #312

---

[60] *Id.* at 189-91.

[61] *Id.* at 210.

[62] Plaintiff testified that, in September of 2007, she "had my evaluation and Mr. Rodriguez signed off on the AGM program saying that I had been through it." *Id*. at 197; *see also id*. at 190-91, 193-97. *See also* Rodriguez Depo. at 173-74 (where Rodriguez testified:  that the Assistant General Manager training program is "a tool the company utilizes to assist in the development of managers who are looking to advance their careers"; that he recommended plaintiff participate in the program; and that she had completed it); *id*. at 196 (same).  Successful completion of the program signified defendant's opinion that a graduate possessed the qualifications necessary "to have the opportunity to develop her career."  *Id*. at 175.

[63] *See* Plaintiff's Depo. at 188-89 ("I had to go through a program that none of the guys had to go through.  That's like the Athens store, when it opened up and there was a GM position available for it, they promoted a guy that had never been through the . . . AGM program."); *id*. at 189-97.  *Cf*. Rodriguez Depo. at 195 (stating that he had no knowledge whether Peter Austin had completed the AGM training program).  Notably, plaintiff offered no evidence other than hearsay statements to support her assertion that Nykael Stewart had not completed the training program.

[64] Plaintiff's Depo. at 204.

[65] *Id*. at 206.

[66] *Id*. at 249.

18

who is profiled in Part II(A), *supra*, was paid more than she.

## E.    The End of Plaintiff's Employment

The events leading to the end of plaintiff's employment began, according to her narrative, before Jim Edwards resigned as General Manager of the Florence Roadhouse.  She alleges that Edwards met in June of 2008 with Julian Ordonez, the manager of a Florence sports bar and grill named "Sidelines," and concocted a plan for Ordonez to cause plaintiff to be fired by lodging a false complaint with defendant's corporate headquarters about plaintiff's alleged "unprofessional conduct" while in the Sidelines bar.[67]  Plaintiff alleges that she knows this because a Sidelines employee named Bionca Sherrod-Holady overheard Edwards and Ordonez hatching

---

[67] See the following passages from plaintiff's deposition:

Q.    Are you contending that Mr. Edwards was trying to get you fired after he himself left the company?

A.    Well, we have proof that there's a witness to Jim and Julian *collaborating a letter at Sidelines* trying to get me fired.

Q.    After he left the company?

A.    Correct.

Q.    Mr. Austin you believe —

A.    *No*, *that was before he left*.  *That was before* [Jim Edwards resigned at the end of July 2008], *that was in June* [when Edwards and Julian Ordonez met in the "Sidelines" Bar].  That [meeting] was before [Edwards resigned at the end of July 2008].

Plaintiff's Depo. at 315 (emphasis and bracketed alterations supplied).

their plan.[68]  Ms. Sherrod-Holady executed a declaration that plaintiff submitted in

opposition to defendant's motion for summary judgment, and the pertinent parts of

that document read as follows:

> I have known Brandy A. Andazola for a number of years.
>
> I worked at Sidelines, a sportsbar/restaurant in Florence, Lauderdale County, Alabama, while Brandy was still employed by Logan's Restaurant in Florence, Lauderdale County, Alabama.
>
> Shortly before Brandy's employment with Logan's ended, Jim Edwards, [who then was] General Manager at Logan's and Brandy's immediate supervisor, came into Sidelines.  I also know Jim because I frequently went to Logan's Restaurant in Florence, Alabama at that time.  Jim sat in a booth in [the] Sidelines bar with Julian Ordonez, a manager at Sidelines.
>
> Jim and Julian were talking loudly enough that I and others in the Sidelines bar could hear what they were saying.
>
> I personally know Jim and Julian were planning ways to get Logan's to fire Brandy because they were making those plans in my presence.
>
> I personally know Jim, Julian, *and Thomas Moody* were going to provide Logan's with false and untruthful information about Brandy to get Logan's to fire Brandy because Jim and Julian were making these plans in my presence.  I personally know Jim, Julian, *and Thomas* were going to make a complaint to Logan's falsely claiming that Brandy was in Sidelines wearing a Logan's manager shirt, drinking, very intoxicated, acting unprofessionally, and causing a scene because Jim and Julian were discussing these things in my presence.
>
> I personally know Jim and Julian were planning how they were going to cause harm and damage to Brandy's character and life because they were making those plans in my presence.
>
> While Jim was at Sidelines, I personally saw, with my own eyes, Jim and Julian *writing a letter which they were to going to have Thomas mail to Logan's to get Brandy fired.*

---

[68] Plaintiff's Depo. at 314-20; doc. no. 38-4 (Declaration of Bionca Sherrod-Holaday), at 1.

I also personally know that Jim and Julian were going to call Logan's to get Brandy fired because they discussed making the call in my presence.

I personally know that Jim, Julian, *and Thomas* were going to make an untruthful complaint to Logan's about Brandy to get her fired because Julian and Jim discussed in my presence how they and Thomas were going to do this.

I never saw Brandy wearing a Logan's manager shirt, drinking, very intoxicated, acting unprofessionally, and causing a scene at Sidelines that night or at any other time.

There were many people in Sidelines bar by the time Jim left Sidelines.  By the time Jim left Sidelines, he had told me and a number of other people in Sidelines' bar who did not work at Logan's that Brandy had been at Sidelines that night wearing a Logan's manager shirt, drinking, very intoxicated, acting unprofessionally, and causing a scene and he was going to get Brandy fired.[69]

According to the Declaration of David Rodriguez submitted in support of

---

[69] Sherrod-Holaday Declaration at 1-3 (bracketed alterations and emphasis supplied).  *See also* Plaintiff's Depo. at 314-42.  The primary obstacle that plaintiff must overcome is to explain how those assertions can be admitted at trial as substantive evidence.  Upon first reading, Ms. Sherrod-Holady's statements about what she allegedly heard Edwards and Ordonez say appears to be classic "hearsay."  *See* Fed. R. Evid. 801(a)–(c).

Even so, Federal Rule of Evidence 801(d)(2)(D) provides that a statement made by a party's agent or employee "is not hearsay" if the statement was uttered "on a matter within the scope of that relationship and while it existed."

One prerequisite for the admission of Edwards's alleged statements to Julian Ordonez under Rule 801(d)(2)(D), therefore, is evidence showing that the statements were uttered while Edwards still was employed by defendant:  *i.e.*, before the end of July 2008.  *The record on that issue is neither clear nor consistent*.

For example, Bionca Sherrod-Holaday's Declaration states that the conversation between Edwards and Ordonez occurred "[s]hortly before Brandy's employment with Logan's ended"– *i.e.*, August 26, 2008 – which would place the event *after* Edwards had resigned.  Sherrod-Holaday Declaration at 1.

On the other hand, David Rodriguez states in his Declaration that the complaint from the manager of Sidelines was received "[i]n June 2008," which – if true – would place the alleged conspiratorial meeting that precipitated the complaint as occurring *before* Edwards's resignation.  Doc. no. 23-1 (Declaration of David Rodriguez) at 2.

Plaintiff's testimony appears to be consistent with Rodriguez's Declaration.  *See supra* note 67 (quoting from page 315 of plaintiff's deposition).

summary judgment, someone identifying himself as "the manager" of "Sidelines" placed a telephone call to "Logan's"[70] in June of 2008, and reported that plaintiff

> had patronized the restaurant's bar the prior evening and caused a scene, all while wearing a Logan's manager shirt.  The complaint also reported that Plaintiff was drinking to excess, being disorderly and intoxicated, and making accusations about the management at *Sidelines* [*sic*].[71]

Furthermore, according to Rodriguez, "[a]t about the same time" as the foregoing report, "Logan's also received information that Plaintiff was fraternizing with hourly employees — whom she supervised — outside of work."[72]

Consequently, Rodriguez says that he "visited Restaurant #312 on or about July 10, 2008 to discuss [both] complaints with Plaintiff," and that he "placed Plaintiff on a Final Written Warning for unprofessionalism."[73]  Plaintiff denies that Rodriguez met with her on July 10, 2008 to discuss any complaints, and she "adamantly" denies that he issued her a "Final Written Warning."[74]

---

[70] *See* doc. no. 23-2 (Plaintiff's Deposition) at 322-26 (defense counsel representing that the complaint was made in a telephone call, and not a writing).  The record before this court does not specify the name of the caller who identified himself as "the manager of another local restaurant, Sidelines," the corporate office to which the telephone call was placed, or the name of the corporate official to whom the call was placed.

[71] Rodriguez Declaration ¶¶ 5 & 6, (emphasis and alteration supplied).

[72] *Id.* ¶ 7.

[73] *Id.* ¶¶ 8 & 9.

[74] Specifically, plaintiff's affidavit states:

> I deny that Rodriguez discussed any complaint with me on July 10, 2008.  I adamantly deny that anyone, including Rodriguez, ever placed me on a Final Written Warning, or any other kind of warning, oral or written, of any kind whatsoever for

Those were not the events that immediately preceded the end of plaintiff's

employment, however.  Instead, on or about August 4, 2008, Thomas Moody, the

hourly-wage employee who was the subject of the sexual harassment complaint that

plaintiff had assisted Ginger Thompson to file sometime prior to September of 2006,[75]

addressed the following letter to defendant's corporate headquarters:

> My name is Thomas Moody, and [I] have been employed as a
> server, bartender, and trainer by your company for the last 8 years.  I am
> currently employed by the Florence, AL location, restaurant #312.
> Although I understand the "chain of command," I am left in a quandary
> because I have an issue that needs to be addressed, *but because we no
> longer have a general manager*,[76] and this issue directly involves *the
> individual that feels she will fill the vacant spot*, I felt it more prudent to
> write this letter.  As I am about to explain, it is a serious, and heartfelt
> issue, but it has been advised to me to initiate action with this letter,
> which will be filed as a legal document.

> Approximately 3 months ago there were 4 vacancies left in my
> current restaurant's bartender positioning.   As I have had years of
> experience bartending, including time at the Chattanooga, TN Logan's
> Roadhouse, I fully expected to be considered for one of the positions.
> The current bar manager, Brandy Andazola, would not even consider me

---

that matter.  Exhibit 1, [the "Final Written Warning," attached] to Rodriguez's
undated declaration is not signed by anybody including, but not limited to, me or
Rodriguez.  Rodriguez's claim that I was placed on a Final Written Warning is an
absolute fabrication by Rodriguez.

doc. no. 38-1 (Plaintiff's Declaration), at 5.

[75] See Part II(A) of this opinion, beginning on page 6, *supra*.

[76] *Nota bene* that the statement emphasized in text reinforces the conclusion that this letter
was drafted during the brief, approximate one-week-interval between Jim Edwards's resignation and
Hank Luking's transfer from Athens to the position of General Manager of defendant's Restaurant
#312 in Florence.

or give me a chance.[77]  After speaking with our general manager at the time, Jim Edwards, and explaining the situation, he over-rode her decision and instructed her to give me an opportunity.

This first provokes the question of why she would not even consider me for one of the positions.  It is a well known fact, here locally, that Brandy practices favoritism/discrimination.  She is a socialite that has tendencies of rewarding the employees that relish in partaking of her vices with her.  I have actually obtained photos of her at our local bars drinking with employees, at least one of which filled one of the bartender positions.  Then there is the party she threw for the employees, which I did not attend.  The party is also a matter of public record, as that 3 employees were arrested that evening at her house, on various charges, all concerning a controlled substance.  Being male I am of no interest to Brandy in a sexual nature, and since I am a single father I tend not to go out socially very often.... [sic] It does seem to me that these facts should not impede my career with Logan's.

Secondly, now that the previous general manager is no longer with the company, it seems to be "open season" on me and my one and only bartending shift.  I currently am the lunch shift bartender on Sundays (typically the shift that nobody wants anyway!)  The last time I worked I actually heard Brandy instruct the S.A. that was on duty NOT to help me.  It seems to me that with this one action she managed to undermine all five of our values....not a simple feat in and of itself.

In a nutshell, the only things that I hope to accomplish by writing this letter are, first, to not be discriminated against in the workplace because I choose not to be social outside of work with my immediate supervisor, and secondly, to be treated with the same courtesy, honest, and respect that Brandy's "favorites" enjoy.  Thank you in advance for

---

[77] David Rodriguez testified plaintiff gave the following explanation for her opposition to Moody's desire to become a bartender:  "She didn't think Thomas Moody would be a good bartender.  She felt that he wasn't a team player.  He wouldn't run food.  Didn't help out doing his side work.  That his personal appearance or uniform standards was lacking."[sic]  Doc. no. 23-5 (Deposition of David Rodriguez) at 160.  Rodriguez further testified that plaintiff did not make him aware of any of Moody's alleged sexual harassment.  Id. at 161.

your attention to these issues.  Please feel free to contact me on my cell phone for any necessary communication[.][78]

A copy of Moody's letter, together with a group of six photographs depicting plaintiff in social situations with other employees,[79] was provided to David Rodriguez on some date that is not clearly specified in this record.[80]  Further, the means by which the documents came into Rodriguez's possession are not entirely clear, although it appears that at least *the photographs* were hand-delivered to him by Moody, while Moody's *letter* may have been transmitted to Rodriguez by Logan's corporate headquarters *and/or* Moody himself.[81]

In any event, a copy of Moody's letter and the photographs depicting plaintiff in social situations with hourly employees became the focus of questions that

---

[78] Defendant's Ex. 13-A to Plaintiff's Depo. (doc. no. 23-4, at 64) (ellipses in the original document, emphasis and bracketed alterations supplied).

[79] The photographs are collectively identified in this record as Defendant's Exhibit 16 to plaintiff's deposition:  *see* doc. no. 23-4, at 67–72.

[80] *See* Rodriguez Depo. at 118, lines 6-18 (where Rodriguez states that he did *not* testify that Thomas Moody "pulled him aside and gave [him] some photographs [of plaintiff] *on* August 25, 2008") (bracketed alterations and emphasis supplied); and, *id*. at 119, lines 5-8 (where Rodriguez said he "believe[s]" that he was given the photographs *before* he arrived at the Florence Roadhouse on August 25, 2008).

[81] For example, when Rodriguez was asked how he obtained copies of the photographs collectively identified as Defendant's Exhibit 16 to plaintiff's deposition, he answered that, when he was in the Florence restaurant on some unspecified date for the purpose of "[e]valuating restaurant operations," Rodriguez Depo. at 110, Thomas Moody "pulled me to the side and said that Brandy was fraternizing and partying with team members, and he handed me the letter and the printouts of the photographs."  *Id*. at 108-09; *see also id*. at 111 (reiterating that Thomas Moody "pulled me to the side and said he had a complaint that Ms. Andazola was fraternizing with team member, and he had the photographs [Defendant's Ex. 16], and he gave those to me").

Rodriguez asked plaintiff during a conference held in the Florence Roadhouse on August 25, 2008.[82]  Hank Luking was the only other person present.

Rodriguez handed the photographs to plaintiff, and asked her a series of questions about both the scenes depicted in the pictures and the accusations contained in Moody's letter.[83]  She explained that the photographs were not of recent vintage, but had been taken two years before, and gave a written statement to that effect.[84] Nevertheless, according to plaintiff, Rodriguez then either asked for, or demanded that she hand over, her keys to the restaurant.[85]  According to plaintiff, she then was "advised to quit because I was about to be fired."[86]  The following day, plaintiff delivered a letter of resignation to Rodriguez reading as follows:  "To Whom It May Concern:  Regretfully, I must resign as Assistant Manager of Logan's Roadhouse Store #312.  Thank you all, for the opportunities and experiences.  Best of luck.

---

[82] *See* Plaintiff's Depo. at 197-202; Rodriguez Depo. at 104-09, 140-41.

[83] Plaintiff's Depo. at 267-78; doc. no. 23-4, Ex. 16 (August 25, 2008 Photographs); Rodriguez Depo. at 107-08, 140-41.

[84] Plaintiff's Depo. at 277-78, 377-81; Rodriguez Depo. at 107-08, 140-41; doc. no. 23-4, at 63 (Defendant's Ex. 12 to Plaintiff's deposition) (handwritten statement reading:  "All of these pictures were taken over 2 years ago.  Most of them taken by Jim Edwards.  If I was in a Logan's Roadhouse shirt it was because I did not know I was not allowed to wear logo's [sic] outside work. As far as the few pictures with team members they were in the same place and pictures were all taken by Jim Edwards.").

[85] *See* doc. no. 23-2 (Plaintiff's Deposition), at 198 ("I need your keys."); *id*. at 313 (testifying that Rodriguez "*demanded* [her keys], took them") (emphasis and bracketed alteration supplied).

[86] *Id*. at 168-69.

Brandy Andazola.  8/26/08."[87]

## III. DISCUSSION

A common element of all Title VII disparate treatment and retaliation claims is "some form of legally cognizable adverse action by the employer."  *Brown v. Brody*, 199 F.3d 446, 453 (D.C. Cir. 1999) (citing *Doe v. Dekalb County School District*, 145 F.3d 1441, 1448 n.10 (11th Cir. 1998)[88]).  An employment action is considered sufficiently "adverse" to be actionable under federal discrimination statutes "*only if* it results in some *tangible*, *negative effect* on the plaintiff's employment."  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (addressing an ADA retaliation claim) (emphasis supplied).[89]  The "classic and ultimate 'tangible employment action'" is, of course, termination of a person's

---

[87] *Id*. at 167-68; doc. no 23-4, Ex. 9 (Resignation Letter).

[88] The *Doe* Court observed in the cited note that:  "An 'adverse employment action' is also an element of two broad types of prima facie discrimination cases:  (1) a prima facie circumstantial case, *see Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989), and (2) a prima facie retaliation case, *see Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997)."  *Doe v. Dekalb County School District*, 145 F.3d at 1448 n.10.

[89] *See also, e.g.*, *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (holding, in context of Title VII retaliation claim, that "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'") (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).  *Cf. Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (holding, in context of Title VII sexual harassment claim, that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

27

employment. *Llampallas v. Mini-Circuits, Lab, Inc*., 163 F.3d 1236, 1246 n.18 (11th Cir. 1998).

The major premise of defendant's motion for summary judgment — indeed, the metaphorical linchpin upon which all other arguments hinge — is the contention that plaintiff "did not suffer any adverse employment action.  Plaintiff voluntarily resigned from her employment at Logan's, and her claim that she was 'discharged' is baseless."[90]

Defendant's reliance upon the Eleventh Circuit's decision in *Ross v. City of Perry*, 396 F. App'x 668 (11th Cir. 2010), as the basis for its argument that plaintiff's "resignation was not involuntary, and therefore it was not an adverse employment action under Title VII,"[91] is misguided.  Wholly apart from the fact that the *Ross* opinion is not published and, therefore, not entitled to binding, precedential weight under Eleventh Circuit Rule 36-2,[92] the substantive law discussed in that opinion is

---

[90] Doc. no. 23 (Brief in Support of Summary Judgment) at 10; *see also*, *e.g.*, *id*. at 9 ("Plaintiff resigned her employment after she learned a fraternization complaint had been filed against her that included inappropriate, offensive pictures of Plaintiff simulating oral sex and 'spanking' employees.  Thus, she cannot establish her prima facie case of discrimination or retaliation because she did not suffer an adverse employment action . . . ."); *id*. at 10-11 ("Plaintiff's resignation was not involuntary [*sic*, double negative], and therefore it was not an adverse employment action under Title VII.").

[91] *Id*. at 10-11 (footnote omitted).

[92] This rule provides, in pertinent part, that:  "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority. . . ." 11th Cir. R. 36-2 (2d sent.). *See also* Eleventh Circuit Internal Operating Procedure 7, stating that:  "The court generally does not cite to its 'unpublished' opinions because they are not binding precedent. . . ." 11th Cir. I.O.P. 7.

out of place in the context of this case: *that is*, the principles discussed in *Ross v. City of Perry* and cases like it apply only to those actions in which the determinative question is whether a plaintiff's resignation from *a public employment position* was voluntary, as opposed to being obtained by coercion or duress, or by misrepresentations of *the public employer*. *See*, *e.g.*, *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568-72 (11th Cir. 1995).

In contrast, the present case raises a much more interesting issue; *that is*: when *an Alabama private employer*, who can fire an employee for *any reason* — a good reason, a bad reason, or no reason at all, so long as the basis for termination is not a violation of federal employment discrimination statutes — acts in a manner that communicates to a reasonably prudent employee that she is about to be terminated, and the employee subsequently resigns, does that amount to either a "constructive discharge," or an "adverse employment action" that rises to the level of an actual termination?

Federal circuit courts of appeals tend to view cases that present such fact patterns in subtly but, nevertheless, substantively different manners. Some circuits analyze such factual scenarios as if they were a sub-category of "constructive discharges," while other circuits treat them as if they amount to an "actual discharge." The Seventh Circuit, for example, has held that, "[w]hen an employer acts in a

manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to [a] constructive discharge." *Equal Employment Opportunity Commission v. University of Chicago Hospitals*, 276 F.3 326, 332 (7th Cir. 2002) (alteration supplied, footnote omitted) (citing, *e.g.*, *Bragg v. Navistar International Transportation Corp.*, 164 F.3d 373, 377 (7th Cir. 1998) ("Constructive discharge exists to give Title VII protection to a plaintiff who decides to quit rather than wait around to be fired.")). *See also*, *e.g.*, *Hunt v. City of Markham, Illinois*, 219 F.3d 649, 655 (7th Cir. 2000) ("A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable.").

The Second and Eighth Circuits, on the other hand, have characterized fact patterns that would lead a reasonably prudent person to believe that her tenure had been terminated as an "actual termination." *See Chertkova v. Connecticut General Life Insurance Co.*, 92 F.3d 81, 88 (2nd Cir. 1996) ("An actual discharge . . . occurs when the employer uses language or engages in conduct that 'would logically lead a prudent person to believe his tenure has been terminated.'") (quoting *National Labor Relations Board v. Trumbull Asphalt Co. of Delaware*, 327 F.2d 841, 843 (8th

Circ. 1964) (Blackmun, J.) (holding that "[t]he fact of discharge . . . does not depend on the use of formal words of firing.  It is sufficient if the words or actions of the employer 'would logically lead a prudent person to believe his tenure had been terminated.'") (quoting *Putnam v. Lower*, 236 F.2d 561, 566 (9th Cir. 1956))).

The Eleventh Circuit fits into the cleavage between the conflicting positions sketched above, and holds that circumstances like those described require an "analysis of the employer's intent" — an inquiry into the totality of circumstances that "must be undertaken with close scrutiny of the evidence in each case." *Thomas v. Dillard Department Stores, Inc*., 116 F.3d 1432, 1434, 1435 (11th Cir. 1997).  The *Thomas* panel approvingly cited opinions of the former Fifth Circuit and the Second and Fourth Circuits:  *i.e.*, *Payne v. Crane Co*., 530 F.2d 198, 199 (5th Cir. 1977) (holding that an actual discharge occurs when an employer "by acts or words, shows a clear intention to dispense with the services of an employee");[93] *Chertkova*, 92 F.3d at 88 (holding that an "actual discharge . . . occurs when the employer uses language

---

[93] The Eleventh Circuit observed in a footnote appended to the *Thomas* Court's citation of *Payne v. Crane Co.*, that the *Payne* opinion

> was not directly on point in that it involved analysis of when termination occurred for purposes of the [ADEA's] statute of limitations, we find that it stands for the general proposition that an employer's conduct manifesting a clear intention to dispense with an employee's services is relevant to the inquiry as to when actual termination has occurred under the ADEA. . . .

*Thomas v. Dillard Dept. Stores, Inc*., 116 F.3d at 1434 n.4 (alteration supplied).

or engages in conduct that would logically lead a prudent person to believe his tenure has been terminated") (citation and internal quotation marks omitted); and *Equal Employment Opportunity Commission v. Service News Co*., 898 F.2d 958, 962 (4th Cir. 1990) ("No specific words need be present to support a finding of actual discharge.").[94]

In short, within the Eleventh Circuit, "[t]he proper legal standard requires analysis of the employer's intent, *which may be inferred not only from words but also from conduct*, as well as the specific circumstances of the challenged job action." *Thomas*, 116 F.3d at 1437 (emphasis supplied); *see also Luna v. Walgreen Co*., 347 F. App'x 469, 473 (11th Cir. 2009) (same). "[I]t is also clear in light of the case law that *the lack of specific words* [*e.g.*, 'you are fired'] is not dispositive." *Thomas*, 116

---

[94] The Eleventh Circuit in *Thomas* commented in a footnote appended to its citation of the Fourth Circuit's opinion in *EEOC v. Service News Co*., that the Court found

> that case to be instructive as to the general proposition that *no specific words are necessary for an actual termination to have occurred*, and that *the proper inquiry involves analysis of all the circumstances*.   In *Service News*, a pregnancy discrimination case under Title VII, the plaintiff alleged that she had been discharged as a result of a meeting with her employer in which he did not explicitly tell her she was terminated but repeatedly expressed concern that she would be injured if she continued to work while pregnant and recounted other instances where pregnant employees had problems on the job.  [898 F.2d] at 960.  The employer argued that the plaintiff had been constructively discharged rather than actually terminated.  *Id*. at 962.  The Fourth Circuit held that "actual discharge rather than constructive discharge was appropriate to this case."  *Id*.

*Thomas*, 116 F.3d at 1434 n.5 (emphasis and alteration supplied).

F.3d at 1437 (emphasis and alteration supplied) (citing *Chertkova*, 92 F.3d at 88, and *Service News*, 898 F.2d at 962).

For example, in the former Fifth Circuit's opinion in *National Labor Relations Board v. Ridgeway Trucking Co.*, 622 F.2d 1222 (5th Cir. 1980), the only issue was whether the employer's General Manager had terminated the employment of striking truck drivers when telling the drivers that "if they were not going to go to work they should leave the property," and that "if they did not leave the premises, he would have to call the authorities." *Id.* at 1223.  The former Fifth Circuit held, in an opinion still binding on this court, that "[a]n employer need not use the term 'fired' in order for a discharge to occur.  *The test of whether an employee was discharged depends upon the reasonable inference that the employees could draw from the language used by the employer.*"  *Id.* at 1224 (emphasis supplied) (citing *Liberty Mutual Insurance Co. v. National Labor Relations Board*, 592 F.2d 595, 604 (1st Cir. 1979); *The C. J. Krehbiel Co.*, 227 N.L.R.B. 383, 384 (1976)).[95]

Defendant's account of the circumstances surrounding plaintiff's departure is sketched in David Rodriguez's deposition, during which he gave the following account of the discussion he and Hank Luking allegedly had with plaintiff on August

---

[95] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on Sept. 30, 1981.

25, 2008.

> We sat down.  [I said:]  Some information had been brought to our attention that we need to talk to you about.  And, you know, we showed [plaintiff] the pictures [that had been submitted by Thomas Moody].  We let her know that we were researching this information.  That it is a serious issue.  And we were going to continue to research, utilize our home office.  You know, *we said it is a terminable offense* and we're going to take it seriously, *but what we would like to do is hold your keys* to protect you from any possibility of being accused of any wrongdoing.  To *go ahead and go home*.  We're going to continue to research, get with our home office, *come back in the morning and we'll discuss any decisions made*.[96]

Even that benign account of the words spoken in plaintiff's last meeting does not support defendant's major premise.  Rather, viewing that chronicle, as this court must, in the light most favorable to plaintiff, the non-moving party, *and*, reading it in conjunction with plaintiff's testimony that Rodriguez either asked for, or demanded that she hand-over, her keys to the restaurant,[97] and that he then "advised [her] to quit because [she] was about to be fired,"[98] this court cannot say, as a matter of law, that

---

[96] Doc. no. 23-5 (Deposition of David Rodriguez), at 140-41 (bracketed alteration and emphasis supplied).

[97] *See* doc. no. 23-2 (Plaintiff's Deposition), at 198 ("I need your keys."); *id*. at 313 (testifying that Rodriguez "*demanded* [her keys], took them") (emphasis and bracketed alteration supplied).

[98] *Id*. at 168-69 (alterations supplied).  In a declaration filed contemporaneously with her Brief in Opposition to the Motion for Summary Judgment, plaintiff asserts that "Rodriguez demanded that I give him my keys, *told me I was fired*, told me [that] *even though I was fired* I could give him a statement of resignation, and told me to leave the premises."  Doc. no. 38-1 (Plaintiff's Declaration), at 7 (alteration and emphasis supplied).  Those statements contradict both the deposition testimony quoted in the text accompanying this marginal note, and the following passages from plaintiff's deposition:

no reasonable employee could draw the same inference that plaintiff has testified she drew from the language used by defendant's Regional Manager.  Consequently, the other arguments asserted by defendant in support of its motion for summary judgment must be addressed.

**A**.    **Termination Based Upon Plaintiff's Sex**

In discharge situations, courts generally require a plaintiff to demonstrate that: (1) she was a member of a class of persons protected by Title VII; (2) she was qualified for the position from which she was discharged; (3) despite her

---

Q.    What is your recollection of the words Mr. Rodriguez used when you gave him — when he took your keys?

A.    "I need your keys."

Q.    All right.

A.    The actual exchange of the keys, "I need your keys."

. . . .

Q.    *What led you to say, just several times today, that you were fired?  What words were used with you that makes you say you were fired?*

A.    The action of him asking — or him saying "I need your keys."

Plaintiff's Depo. at 198-199 (emphasis supplied).  Plaintiff cannot now create a genuine issue of material fact by submitting a sham affidavit, *i.e.*, an affidavit which, without explanation, directly contradicts her deposition testimony. *See Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1983) ("When a party has given clear answers to unambiguous questions which negate the existence of a genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit if it merely contradicts, without explanation, previously given testimony.").

qualifications, she was discharged; and (4) following the termination of her employment, the defendant either replaced plaintiff with someone outside the protected class, or retained other employees who were not within the protected class and who possessed comparable or lesser qualifications.[99]

Shifting the frame of reference slightly, the Eleventh Circuit has sometimes held that a plaintiff seeking to make out a *prima facie* case of disparate treatment discrimination in the termination of his or her employment "must generally show that (1) plaintiff is a member of a protected class; (2) plaintiff suffered an adverse employment action; (3) the employer treated similarly situated employees outside of the protected class more favorably; and (4) plaintiff was qualified to do the job." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001)); *see also*, *e.g.*, *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). That is the formulation which will be applied here; and, in doing so, the only element requiring discussion is the third: whether defendant treated similarly-situated male employees more favorably.[100]

---

[99] *See*, *e.g.*, *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 n.6 (11th Cir. 1998); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980).

[100] That is because, as a female, plaintiff is a member of a class protected by Title VII; further, as discussed in the beginning of this part of the opinion, the question of whether plaintiff was discharged or resigned is a genuine issue of material fact that cannot be resolved by this court as a

Some binding authorities have allowed the third element of the applicable *prima facie* formulation to be satisfied upon a showing "that the misconduct for which [the plaintiff] was discharged was nearly identical to that engaged in by a male employee whom [the employer] retained." *Davin v. Delta Airlines, Inc.*, 678 F.2d 567, 570 (5th Cir. Unit B 1982)[101] (alterations supplied); *see also Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984) (same). "When an individual proves that [she] was fired but one outside [her] class was retained although both violated the same work rule, this raises an inference that the rule was discriminatorily applied against that individual, regardless of the race or sex of the replacement." *Id*. at 1186.

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (internal quotations and citations omitted). *We require*

matter of law, but must be submitted to a jury; and, finally, the Eleventh Circuit has recognized that, in cases such as the present one, "where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred." *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987); *see also Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983) (same).

[101] In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of the "Unit B" panel of the former Fifth Circuit handed down after September 30, 1981.

> *that the quantity and quality of the comparator's misconduct be nearly
> identical* to prevent courts from second-guessing employers' reasonable
> decisions and confusing apples with oranges. *See Dartmouth Review v.
> Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation
> is neither likely nor necessary, but the cases must be fair congeners. In
> other words, apples should be compared to apples.").

*Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (emphasis supplied).

Thus, plaintiff must show that male employees of defendant were guilty of the same, or "nearly identical," misconduct, yet were not terminated, or were disciplined in different ways. *Id.*; *see also, e.g., Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001) ("The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed."). "Absent some other similarly situated but differently disciplined worker, there can be no disparate treatment." *Abel v. Dubberly,* 210 F.3d 1334, 1339 (11th Cir. 2000).

Prior to asking plaintiff for her keys, David Rodriguez told her that she was under investigation for violation of defendant's anti-fraternization policy. In response to the motion for summary judgment, plaintiff alleges that Rodriguez was himself guilty of violating the same policy. She presented a photograph depicting Rodriguez embracing Lindsey Nichols, the hostess of Restaurant #312, whose head

is nuzzled on his left shoulder.[102]   According to plaintiff, Rodriguez paid a great deal of attention to Ms. Nichols whenever he was in the Florence Roadhouse.

> I mean, this would be a typical picture when . . . Lindsey Nichols was working.  That's where he stayed [—] up there right beside her, all over her.  If she walked out to the front, to the front doors, there is where he was.  Wherever she went[,] that's were he was.[103]

She also alleged that she had personally observed Rodriguez "hugging all over" the female bartenders of Logan's Decatur Roadhouse,[104] and testified that he had asked hourly employees to accompany him on trips to Tunica, Mississippi, to watch him box.[105]

Rodriguez is not a fair comparitor.  The fraternization allegedly engaged in by him is different from plaintiff's, because the gravamen of Thomas Moody's complaint was that plaintiff rewarded the hourly employees with whom she socialized, whereas plaintiff presented no evidence that Rodriguez exhibited favoritism in the assignment, schedule, or promotion of any female employees who allegedly became the subject of his attention.[106]   Accordingly, summary judgment is due to be entered in favor of

---

[102] *See* doc. no. 39-3 (top photograph); doc. no. 23-2 (Plaintiff's Deposition), at 288, 290, 305.

[103] Plaintiff's Depo. at 290 (alterations supplied).

[104] *Id.* at 308 ("I'm talking about when he [Rodriguez] comes in my restaurant and Lindsey Nichols is there and he's hugging all over her.  Or he comes in Decatur and he's hugging all over Brandy Carr or Stephanie Hussler, the bartenders in Decatur.").

[105] Plaintiff's Declaration at 4.

[106] The same qualitative difference exists with the activities of those male managers about

39

defendant on this version of plaintiff's termination claim.

## B. Termination in Retaliation for Protected Conduct

Plaintiff alternatively contends that she was fired in retaliation for her protected activities.[107]  She separately alleges that she personally complained about the sexual harassment of both Peter Austin and Thomas Moody (opposition clause), and assisted Ginger Thompson to draft and lodge a written complaint against Moody on some date prior to September of 2006 (participation clause).[108]

---

whom plaintiff complains.  *See* doc. no. 38-1 (Plaintiff's Declaration) at 4 ("I was disciplined and fired for allegedly fraternizing with hourly employees.  No male Logan's manager at Logan's in Florence, Alabama was ever disciplined or fired for fraternizing with hourly employees.").

[107] "Retaliation is a separate violation of Title VII."  *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).

[108] Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Congress thus recognized two predicates for retaliation claims:  one for *opposition* to discriminatory practices, and another for *participation* in protected activity.

> Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." . . . And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (citations omitted).

Generally speaking, a plaintiff must satisfy three elements in order to establish a *prima facie* case of retaliation:  (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action.  *See*, *e.g.*, *Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002); *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).  "If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate reason for the adverse action."  *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is a pretext for retaliation.  *See id*.

The third *prima facie* element is the only one requiring discussion.

The demonstration of a casual linkage at the summary judgment stage is far less onerous than proving causation by a preponderance of the evidence at trial.  At the summary judgment stage, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Equal Employment Opportunity Commission v. Reichhold Chemical, Inc.*, 988 F.2d

1564, 1571-72 (11th Cir. 1993)).

"Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." *Bass*, 256 F.3d at 1119 (citing *Gupta v. Florida Board of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)); *see also*, *e.g.*, *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (holding that "a close temporal proximity between two events may support a finding of a causal connection between those two events.") (citing *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action *is* sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.") (emphasis supplied)).

Conversely, when there is an extended period of time between the protected activity and the adverse action, the less likely it becomes that a causal linkage between the two events will be found.  Indeed, as the Supreme Court has observed, the temporal gap must be "very close" in order to support the conclusion of a causal linkage.  *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*) (quoting *O'Neal v. Ferguson Construction Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), and also citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997), and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992), for the

proposition that three- and four-month gaps, respectively, between an employer's knowledge of protected activity and an adverse employment action are not sufficiently close to serve as circumstantial evidence of a causal relationship between the two events).[109]

The pertinent question in a case such as this one, where there is no evidence directly linking plaintiff's protected activities to the termination of her employment, is: "*How long is too long?*"  The Eleventh Circuit has held that a temporal gap of only one month between the plaintiff's act of filing an EEOC charge alleging that her employer denied her a sales representative position because of her sex and subsequent termination of the plaintiff's employment was sufficiently close to establish a causal nexus. *Donnellion v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1996) ("The short period of time . . . between the filing of the discrimination complaint and the plaintiff's discharge belies any assertion by the defendant that the plaintiff failed to

---

[109] In full text, the Supreme Court's statement in *Breeden* is as follows:

The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001).  *See e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient).  Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001) (*per curiam*).

prove causation.").  On the other hand, the Supreme Court has held that a temporal gap of twenty months "suggests, by itself, no causality at all." *Breeden*, 532 U.S. at 274.

Here, the event that proximately caused David Rodriguez to initiate an investigation into plaintiff's alleged violations of defendant's anti-fraternization policy was the letter that Thomas Moody mailed on or after August 4, 2008. Significantly, however, plaintiff's acts of assisting Ginger Thompson to draft and lodge a formal written complaint about Moody's sexual harassment, and plaintiff's hand-delivery of that charge to the General Manager of the Florence restaurant, all occurred on some unspecified date prior to September of 2006, nearly two full years prior to plaintiff's August 25, 2008 conference with Rodriguez and Hank Luking. That is too long to circumstantially support a conclusion of causation.  *See*, *e.g.*, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 n.4 (11th Cir. 2001) (opining that a two year break between the plaintiff's grievance and the employer's adverse action "probably would prevent a court from finding a causal nexus"); *Maniccia*, 171 F.3d at 1369-70 (holding that gaps of fifteen and twenty-one months between the employee's and employer's respective actions were too great to support a causal nexus).

Plaintiff also testified that she complained to David Rodriguez about Moody's

44

sexual harassment of female employees, and that her termination was in retaliation for those complaints.[110]  The rub lies in the fact that plaintiff either could not, or did not, specify the dates on which she allegedly lodged such complaints if, in fact, she did so.  Consequently, there is no basis for determining whether there is a causal linkage, and summary judgment also is due to be entered in favor of defendant on the alternative aspect of plaintiff's retaliation claim.

C.   **Plaintiff's Failure to Promote Claims**

Plaintiff's failure to promote claims grow out of the fact that she was twice passed-over for promotion to General Manager positions:  first, when defendant transferred Hank Luking from its newly-opened, Athens Roadhouse facility to Roadhouse #312 in Florence, following Jim Edwards's resignation; and, second, when Nykael Stewart was named as Luking's replacement in Athens.

A plaintiff who asserts that an employer violated federal employment discrimination statutes by failing to promote her must satisfy four *prima facie* elements:  (1) she is a member of a protected group; (2) she applied for, and was

---

[110] As stated in note 34, *supra*, plaintiff testified that she also complained on unspecified dates to Regional Manager David Rodriguez about Moody's sexual harassment of female employees, *see* Plaintiff's Depo at 258-59, but he denied that.  *See, e.g.*, Rodriguez Depo. at 40-41; *id*. at 87 (testifying that he "never received a complaint" from plaintiff or anyone else accusing Moody of sexual harassment); *id*. at 123-24 (testifying that plaintiff did not testify truthfully when saying that she complained to him about Moody's sexual harassment during the August 25, 2008 conference, just prior to the end of her employment).

qualified to fill, a position for which the defendant was accepting applications; (3) despite her qualifications, she was rejected for promotion; and (4) after plaintiff's rejection, the employer *either* kept the position open, *or* filled it with a person outside her protected class. *See, e.g.*, *Walker v. Mortham*, 158 F.3d 1177, 1179 n.2, 1185-93 (11th Cir. 1998) (explaining that a plaintiff need not introduce evidence of the relative qualification of the person promoted instead of plaintiff as part of her *prima facie* case for failure to promote). The issues with respect to both of plaintiff's failure to promote claims are the same and, thus, the court will analyze the *prima facie* elements simultaneously.

It is not disputed that plaintiff, as a female, is a member of a class protected by Title VII, or that she was twice passed-over for promotion, or that each promotion was awarded to a male. Thus, defendant's motion for summary judgment pivots upon the second element, and the question of whether plaintiff was qualified to fill the promotional positions she sought.[111]

---

[111] It is important to observe that the second element of a *prima facie* failure to promote claim contains two components. First, the plaintiff must show that she *applied for* the promotion she was denied. *See*, *e.g.*, *Crawford v. Western Electric Company, Inc.*, 614 F.2d 1300, 1315 (5th Cir. 1980). Here, however, the first component is satisfied because defendant does not dispute that plaintiff asked to be promoted to General Manager of Roadhouse #312 following the resignation of Jim Edwards, and then for the General Manager position vacated when Hank Luking was transferred from Athens to Florence.

The remaining component of the second *prima facie* element requires a plaintiff to show that she was *qualified for* the positions she sought, *id.*, and that is the precise point which defendant denies.

David Rodriguez testified in the following passages from his Declaration that he did not consider plaintiff qualified to be promoted to a General Manager position because, on or about July 10, 2008, he allegedly had placed plaintiff on a "Final Written Warning" for unprofessional conduct:

5.   In June 2008, Logan's received a complaint about Plaintiff from the manager of another local restaurant, Sidelines.

6.   The complaint stated that Plaintiff had patronized the restaurant's bar the prior evening and caused a scene, all while wearing a Logan's manager shirt. The complaint also reported that Plaintiff was drinking to excess, being disorderly and intoxicated, and making accusations about the management at Sidelines.

7.   At about the same time, Logan's also received information that Plaintiff was fraternizing with hourly employees — whom she supervised — outside of work.

8.   I visited Restaurant #312 on or about July 10, 2008 to discuss these complaints with Plaintiff.

9.   Also as a result of these complaints, I placed Plaintiff on a Final Written Warning for unprofessionalism. A copy of the Final Written Warning is attached hereto as Exhibit 1.

10.   *Because Plaintiff was on a Final Written Warning, I did not consider her to be qualified for a promotion to General Manager.*

11.   On or about August 25, 2008, I visited Restaurant #312 to discuss yet another complaint of alleged fraternization and unprofessional conduct with Plaintiff. The next day, Plaintiff approached me at the restaurant and handed me a letter which states, "Regretfully, I must resign as assistant Manager of Logan's Roadhouse Store #312. Thank you all, for the opportunities and experiences. Best

of luck.  Brandy Andazola."[112]

As previously noted in Part II(E) of this opinion, plaintiff denies that Rodriguez met with her on July 10, 2008, and she "adamantly" denies that he issued her a "Final Written Warning."[113]  Plaintiff's denial draws strength from the fact that the copy of the "Final Written Warning" allegedly issued to her, and attached to Rodriguez's Declaration as "Exhibit 1," is neither dated nor signed by him or by plaintiff.[114]  Thus,

---

[112] Doc. no. 23-1 (Declaration of David Rodriguez) ¶¶ 5–11, at 2-3 (emphasis supplied).

[113] Specifically, plaintiff states:

> I deny that Rodriguez discussed any complaint with me on July 10, 2008.  I adamantly deny that anyone, including Rodriguez, ever placed me on a Final Written Warning, or any other kind of warning, oral or written, of any kind whatsoever for that matter.  Exhibit 1, [the "Final Written Warning," attached] to Rodriguez's undated declaration is not signed by anybody including, but not limited to, me or Rodriguez.  Rodriguez's claim that I was placed on a Final Written Warning is an absolute fabrication by Rodriguez.

Doc. no. 38-1 (Plaintiff's Declaration), at 5.

[114] *See* Rodriguez Declaration, Ex. 1.  The text of the Warning allegedly issued to plaintiff reads as follows:

> This memo will serve to document our conversation today regarding our concern that your recent behaviors have demonstrated a lack of professionalism, as well as embarrassing our company within the community.  Specifically, we have received complaints about a recent incident that occurred in another establishment.  While there, you were noted as drinking to excess, making accusations about the management, and being disorderly.  Since you were wearing a Logan's manager shirt at the time, these behaviors do not reflect well on Logan's as well as your professionalism.  Further, we have a growing concern that you may be in violation of our fraternization policy, having relationships with hourly team members outside of the restaurant.  At no time is it acceptable to fraternize with the team members you lead, as it undermines your ability to manage your team, diminishes their respect for your authority, and gives the perception of favoritism.
>
> We are now in the unfortunate position of questioning your ability to continue

the question of whether plaintiff was ever placed on a "Final Written Warning" is a genuinely-disputed issue of material fact.  Further, at the summary judgment stage, a court must review all evidence in favor of the non-moving party.  *See Chapman*, *e.g.*, 229 F.3d at 1023.  Accordingly, this court must assume that plaintiff was not placed on a Final Written Warning, and that she satisfies the second element of a *prima facie* failure to promote claim.  The burden, therefore, shifts to defendant to present some other, legitimate, non-discriminatory reason for twice failing to promote plaintiff.[115]

Defendant's alternative response is, at best, confusing.  Defendant argues that plaintiff "cannot show she was similarly situated to either of [the] individuals"

---

in the role of manager for Logan's, as we expect our managers to represent Logan's in a professional manner at all times and act as behavioral role models in living our values.  Our confidence in your professionalism is severely eroded and you will need to work hard to regain our trust.

This memo serves to review our expectations and also as a Final Written Warning regarding this matter.  Any further violations of our Values, rules or policies will be subject to disciplinary action, up to and including separation.  *Another expectation is that you in no way retaliate against anyone regarding this matter or be subject to immediate separation.*

Brandy, your signature serves as an acknowledgment that you understand and commit to comply with our policies and represent Logan's as a professional at all times.

*Id*. (emphasis in original).  As noted in text, however, the copy of the foregoing document that was attached to David Rodriguez's Declaration as Exhibit 1 does not bear plaintiff's signature.

[115] *See*, *e.g.*, *McDonnell Douglas*, 411 U.S. at 802-03; *Meeks v. Computer Associates, International*, 15 F.3d 1013, 1021 (11th Cir. 1994).

promoted instead of her:[116]  a contention that this court construes as saying that plaintiff was *less qualified* than either Hank Luking or Nykael Stewart.

When an employer offers as its reason for not promoting a plaintiff the assertion that the person who was promoted was "more qualified," and the plaintiff responds by asserting that she was equally or more qualified than the person promoted, the plaintiff can survive summary judgment only if the "disparities in qualifications [are] of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006); *see also Ash*, 546 U.S. at 456-58.[117]  Moreover, "a plaintiff employee may not

_____

[116] *See* doc. no. 23 (Brief in Support of Summary Judgement), at 16.

[117] In *Ash*, the Supreme Court found that the Eleventh Circuit erred in holding that "[p]retext can be established through comparing qualifications only when 'the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face.'"  546 U.S. at 456-57 (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004)).  The Court declined to "define more precisely what standard should govern pretext claims based on superior qualifications," and held instead that "some formulation other than the test the Court of Appeals articulated in this case would better ensure that trial courts reach consistent results." *Id.* at 458.  The Court, nevertheless, observed that other

> Federal courts, including the Court of Appeals for the Eleventh Circuit in a decision it cited here, have articulated various other standards, *see*, *e.g.*, *Cooper*, *supra*, at 732 (noting that "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question" (internal quotation marks omitted)); . . .

establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, as long as the reason is one that might motivate a reasonable employer." *Pennington*, 261 F.3d at 1267 (citation omitted); *see also, e.g.*, *Rowell v. BellSouth Corp.*, 433 F.3d 794, 798–99 (11th Cir. 2005) (explaining that "[i]t is by now axiomatic that we cannot second-guess the business decisions of an employer").

1.     **The promotions awarded to Hank Luking**

Without any question, Hank Luking had significant experience as a General Manager of at least two other restaurants owned and operated by defendant (*e.g*., the Decatur and Athens facilities), while plaintiff had never served as the permanent General Manager of a "Logan's Roadhouse" restaurant.[118]   Her abbreviated experience as *acting* General Manager of the Florence Roadhouse for no more than a week is not comparable to Luking's extensive experience as an *actual* General Manager.   Admittedly, plaintiff had some experience as a general manager of other restaurants,[119] but none were owned or operated by defendant.   Consequently, that experience was neither within the knowledge of defendant's decision-makers, nor comparable to Luking's experience working as a General Manager of several

*Id.* at 457.

[118] Doc. no. 23-2 (Plaintiff's Deposition), at 210, 216-17.

[119] *See id.* at 214-16.

restaurants owned by defendant.

In short, Luking *clearly* was more qualified for the positions sought by plaintiff, and plaintiff has hardly demonstrated "disparities in qualifications [that are] of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Cooper*, 390 F.3d at 732. Because plaintiff fails to present evidence sufficient to create a triable issue as to pretext, summary judgment is due to be entered in favor of defendant on plaintiff's claims related to the promotional positions awarded to Hank Luking.

That conclusion does not end the discussion of plaintiff's failure to promote claims, however. The court now must address defendant's asserted, non-discriminatory reason for promoting Nykael Stewart to General Manager of its Athens Roadhouse, following Luking's transfer to Florence.

## 2. The promotion awarded to Nykael Stewart

Defendant's *brief* asserts that Stewart was promoted because he was *Assistant General Manager* of the Athens restaurant at the time of Luking's transfer.[120]

---

[120] Brief in Support of Summary Judgment at 17, 19.

Further, Logan's decision not to promote Plaintiff was based on the superior qualifications of Luking, the fact that [Nykael Stewart] was already working as an Assistant Manager at the Athens store when he was promoted to General Manager, as well as the fact that Plaintiff was not qualified for the position because she was

However, defendant does not provide any *evidence* showing either that Stewart held the position alleged, or that it was the reason he was promoted.

On a motion for summary judgment, the defendant must clearly set forth *through the presentation of evidence* the reason(s) for a plaintiff's rejection. *See, e.g.*, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993) ("Thus, the *McDonnell Douglas* presumption places upon the defendant the burden of producing an explanation to rebut the *prima facie* case — *i.e.*, the burden of '*producing evidence*' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'") (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)) (emphasis added).  Thus, a reason asserted only in a defendant's *brief*, and never asserted in or supported by *the evidentiary record*, is not sufficient to meet the defendant's burden.  Because defendant has failed to present evidence demonstrating that the non-discriminatory reason asserted in its brief was the actual reason for promoting plaintiff, it failed to satisfy the second step of the

---

currently on a final written warning.

. . .

Logan's transferred Luking, a General Manager, to another General Manager position, and Stewart was already a manager within the store for which he became General Manager.

*Id.*

*McDonnell Douglas* framework.  Thus, summary judgment is due to be denied on

plaintiff's claim that she was discriminated against when defendant promoted Nykael

Stewart, rather than her, to the position of General Manager of Logan's Athens

Roadhouse restaurant.

**D**.   **Gender-Based Wage Disparity Claims**

The Equal Pay Act was enacted in 1963, and made part of the Fair Labor

Standards Act of 1938, 29 U.S.C. § 201 *et seq*., under which it has been administered

and enforced.  The text of the statute prohibiting discrimination in the payment of

wages on the basis of an employee's sex provides, in relevant part, that:

> No employer having employees subject to any provisions of this
> section shall discriminate, within any establishment in which such
> employees are employed, between employees on the basis of sex by
> paying wages to employees in such establishment at a rate less than the
> rate at which he pays wages to employees of the opposite sex in such
> establishment *for equal work on jobs the performance of which requires*
> *equal skill, effort, and responsibility, and which are performed under*
> *similar working conditions*, except where such payment is made
> pursuant to (*i*) a seniority system; (*ii*) a merit system; (*iii*) a system
> which measures earnings by quantity or quality of production; or (*iv*) a
> differential based on any other factor other than sex:  . . . .

29 U.S.C. § 206(d)(1) (emphasis supplied).  An employee establishes a *prima facie*

Equal Pay Act claim by "showing that [her] employer paid employees of opposite

genders different wages for equal work for jobs which require 'equal skill, effort, and

responsibility, and which are performed under similar working conditions.'"  *Steger*

*v. General Electric Co.*, 318 F.3d 1066, 1077-78 (11th Cir. 2003) (quoting *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995)); *see also Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992) ("A plaintiff suing under the Equal Pay Act must meet the fairly strict standard of proving that she performed substantially similar work for less pay."). "A plaintiff establishes a *prima facie* case by comparing the jobs held by the female and male employees, and by showing that those jobs are substantially equal, *not* by comparing the skills and qualifications of the individual employees holding those jobs." *Brock v. Georgia Southwestern College*, 765 F.2d 1026, 1032 (11th Cir. 1985) (emphasis supplied).

"Once the employee presents a prima facie case, the employer may avoid liability by proving by a preponderance of the evidence that the pay differences are based on '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) . . . any other factor other than sex.'" *Id.* at 1078 (quoting 29 U.S.C. § 206(d)(1)).

> The burden to prove these affirmative defenses is heavy and must demonstrate that "'the factor of sex provided no basis for the wage differential.'" *Irby*, 44 F.3d at 954 (quoting *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th Cir. 1994)). Further, the employer must show that none of the decision-makers, whether in middle or upper management, were influenced by gender bias. *See Anderson v. WBMG-42*, 253 F.3d 561, 566 (11th Cir. 2001). Although an employer may not rely on a "general practice" as a factor "other than sex," [*Increase Minority Participation by Affirmative Change Today of*

> *Northwest Florida, Inc. (IMPACT) v. Firestone*, 893 F.2d 1189, 1194
> (11th Cir. 1990)], it may consider factors such as the "'unique
> characteristics of the same job; . . . an individual's experience, training
> or ability; or . . . special exigent circumstances connected with the
> business.'" *Irby*, 44 F.3d at 955 (quoting *Glenn v. General Motors
> Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988)). An employer's evidence
> of its routine practices is relevant to prove that its conduct at a particular
> time conformed to its routine practices. Federal Rule of Evidence 406.

*Id.* (bracketed alteration supplied). Then, if the employer satisfies the burden to prove

an affirmative defense, the burden shifts back to the plaintiff to "rebut the explanation

by showing with affirmative evidence that it is pretextual or offered as a post-event

justification for a gender-based differential." *Irby*, 44 F.3d at 954.

The only male employee plaintiff cites as a relevant comparator is Peter Austin.

Defendant admits, through the declaration of David Rodriguez, that Austin was paid

more than plaintiff.[121] Even so, plaintiff cannot make out a *prima facie* Equal Pay Act

claim for the difference between her pay and that of Austin because she cannot show

that they performed "equal work on jobs the performance of which require[d] equal

skill, effort, and responsibility." 29 U.S.C. § 206(d)(1) (alteration supplied); *see also*

*Steger*, 318 F.3d at 1077-78. Plaintiff was employed in the position of Bar

Manager.[122] Austin was employed as Kitchen Manager.[123] Plaintiff neither asserted,

---

[121] Doc. no. 23-1 (Declaration of David Rodriguez) ¶ 14.

[122] Doc. no. 23-2 (Plaintiff's Deposition), at 89-102, 187.

[123] *Id.* at 187.

nor provided evidence tending to show, that those positions required "equal skill, effort, and responsibility," or that they were "performed under similar working conditions." Additionally, as the job title of "Kitchen Manager" indicates, the duties of that position would require the occupant to possess cooking, food preparation, and kitchen management skills, and it would entail responsibility for the kitchen area of the restaurant. A "Bar Manager," on the other hand, likely would be required to possess a very different skillset (*e.g.*, drink preparation, bar management, operation of a cash register, and accounting functions), and would be responsible for an entirely different area of the restaurant.

Even assuming that plaintiff established a *prima facie* Equal Pay Act claim, defendant asserts a factor other than sex to explain the pay differential. Defendant states that Austin was paid more than plaintiff because he had been employed by the company for a substantially longer period of time — three years and eleven months longer.[124] Plaintiff does not dispute that Austin was employed longer than she, nor does she dispute that the length of time an employee worked for defendant is a legitimate factor in determining the amount paid in salary. Significantly, plaintiff presents no evidence to show that defendant's asserted reason for the pay disparity

---

[124] Austin had been employed by defendant since October 2000, while plaintiff began her employment with defendant in September 2004. Rodriguez Declaration ¶ 14 ("Mr. Austin was employed with Logan's since October of 2000 and was paid more than plaintiff because of his longer tenure with the Company."); Plaintiff's Depo. at 89-102.

is pretextual.  In fact, the evidence she does present tends to corroborate defendant's assertion that it paid higher salaries to those persons employed by the company for longer periods of time:  *i.e.*, plaintiff received a pay raise each year she was employed by defendant.[125]

Even though it is not clear whether plaintiff asserts a gender-based wage-discrimination claim under Title VII, the court will assume that she intended to do so,[126] and analyze it accordingly.  An employee establishes a *prima facie* case of gender-based wage-discrimination under Title VII "by demonstrating [1] that she is female and [2] that the job she occupied was similar to higher paying jobs occupied by males."  *Miranda*, 975 F.2d at 1529 (bracketed alterations supplied); *see also Meeks*, 15 F.3d at 1019.  Production of evidence establishing those elements gives rise to a presumption that the employer intended to discriminate on the basis of sex, and the employer then must articulate a legitimate, non-discriminatory reason for the pay disparity.  *Miranda*, 975 F.2d at 1529; *Meeks*, 15 F.3d at 1019.  If the defendant articulates a legitimate, non-discriminatory reason, "the burden returns to the plaintiff to establish by a preponderance of the evidence that the proffered justifications are

---

[125] Plaintiff's Depo. at 206.

[126] *See* doc. no. 1 (Complaint), at 6 ("Andazola's membership in a protected class or association with a protected class was a motivating factor in Logan's decision to pay male employees more than female employees such as Andazola, . . . .").

58

actually a pretext for gender-based discrimination." *Miranda*, 975 F.2d at 1529.

As discussed above in relation to plaintiff's Equal Pay Act claim, defendant asserts a legitimate, non-discriminatory reason for paying Austin more than plaintiff (Austin was employed by defendant for a far longer period than plaintiff), and plaintiff presents no evidence to show that defendant's stated, non-discriminatory explanation for the disparity is pretextual.  For those reasons, summary judgment is due to be granted in favor of defendant on plaintiff's wage-disparity claim, regardless of whether it is analyzed under the Equal Pay Act or Title VII.

## E.  State Law Claims

Plaintiff also alleged four state-law tort claims in her complaint:  a claim for intentional infliction of emotional distress; another for negligent hiring, training, supervision, and retention; a third for defamation; and, finally, a claim for invasion of privacy.  Each is addressed in the remainder of this opinion.

### 1.  Intentional infliction of emotional distress

Plaintiff withdrew her claim for intentional infliction of emotional distress (sometimes referred to as Alabama's "tort of outrage") in the brief she filed in opposition to the motion for summary judgment.[127]  Accordingly, summary judgment

---

[127] *See* doc. no. 36 (Brief in Opposition to Summary Judgment), at 26-27 ("Even though Andazola is convinced that the facts of her case meet the elements of the tort of outrage in the State of Alabama[,] Andazola foregoes and withdraws her claim of the tort of outrage against Logan's.").

is due to be entered in favor of defendant on that claim.

## 2.    Invasion of privacy and defamation

Plaintiff contends that she suffered an invasion of privacy and was slandered when Edwards and Ordonez met in the "Sidelines" Bar and Grill during June of 2008,[128] and allegedly concocted a plan for Ordonez to cause plaintiff's firing by lodging a false complaint about her "unprofessional," intoxicated conduct while in the Sidelines Bar wearing a Logan's manager shirt.[129]

Liability for defamation under Alabama law hinges upon proof of the following four elements:

> 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.

*McCaig v. Talladega Publishing Co., Inc.*, 544 So. 2d 875, 877 (Ala. 1989) (citing *Restatement* (Second) *of Torts* § 558 (1977)).

The tort named "invasion of privacy" actually comprises four distinct wrongs under Alabama law: *i.e.*,

> 1) the intrusion upon the plaintiff's physical solitude or seclusion; 2)

---

[128] *See* Complaint at 12-16; Brief in Opposition to Summary Judgment at 28-32.

[129] See Part II(E) of this opinion, *supra*; Plaintiff's Depo. at 314-42; and doc. no. 38-4 (Declaration of Bionca Sherrod-Holaday), at 2.

publicity which violates the ordinary decencies; 3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; and 4) the appropriation of some element of the plaintiff's personality for a commercial use.

*Phillips v. Smalley Maintenance Services, Inc.*, 435 So. 2d 705, 708 (1983). Only one of those wrongs is relevant here: "putting the plaintiff in a false, but not necessarily defamatory, position in the public eye." *Id.*[130]

The Alabama Supreme Court adopted the Restatement of Torts definition of the "false light" variant of the invasion of privacy tort. *See Schifano v. Greene County Greyhound Park, Inc.*, 624 So. 2d 178 (Ala. 1993) (applying the *Restatement* (Second) *of Torts* § 652E (1977) when ruling on a false light invasion of privacy claim). The Restatement defines the elements of that tort as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Restatement* (Second) *of Torts* § 652E (1977).

---

[130] *See* Brief in Opposition to Summary Judgment at 31-32 ("Andazola has proven that Logan's, by and through Edwards, Austin, Moody, and Rodriguez have put her in a false light in the public eye and in the eye of the restaurant community in Florence.").

Plaintiff's *complaint* does not allege any specific facts or events as the basis for her defamation or invasion of privacy claims.[131]   Her *brief* only discusses the conversation between Edwards and Ordonez at "Sidelines" as the factual basis for her defamation claim,[132] and does not present a factual basis for her invasion of privacy claim.  Instead, plaintiff's brief addresses the latter claim only when stating (with a citation to Bionca Sherrod-Holaday's declaration) that "Andazola has proven that Logan's, by and through Edwards, Austin, Moody, and Rodriguez have put her in a false light in the public eye and in the eye of the restaurant community in Florence."[133]

Even assuming for the sake of discussion that the conversation between Edwards and Ordonez in the "Sidelines" Bar can form the basis for defamation and invasion of privacy claims, plaintiff failed to show that *defendant* is liable for the words and conduct of those individuals.  Defamation and invasion of privacy are both intentional torts.  *See*, *e.g.*, *Serra Chevrolet, Inc. v. Reylander*, 975 So. 2d 909, 910 (Ala. 2007) (referring to defamation and invasion of privacy as "intentional torts") (quoting *Potts v. Baptist Health System, Inc.*, 853 So. 2d 194, 195 (Ala. 2002)); *Surrency v. Harbison*, 489 So. 2d 1097, 1101 (Ala. 1986) (describing defamation as

---

[131] *See* doc. no. 1 (Complaint), at 12-16.

[132] *See* Brief in Opposition to Summary Judgment at 28-31.

[133] *Id.* at 31-32.

an intentional tort).  And, an employer can be held liable for the intentional torts of its employees only if it is proven that:  "(1) the employee's acts [were] committed in furtherance of the business of the employer; (2) the employee's acts [were] within the line and scope of his employment; or (3) the employer participated in, authorized, or ratified the tortious acts."  *Ex parte Atmore Community Hospital*, 719 So. 2d 1190, 1194 (Ala. 1998) (alterations supplied) (citing *Potts v. BE&K Construction Co.*, 604 So. 2d 398, 400 (Ala. 1992)).

Here, Ordonez was not defendant's employee and, thus, defendant cannot be liable for his conduct.  Additionally, plaintiff presents inconsistent evidence on the critical question of whether the conspiratorial conversation between Edwards and Ordonez in the Sidelines Bar occurred while Edwards still was employed by defendant.  Of course, if Edwards was not employed by defendant on the date the alleged conspiracy was hatched, defendant cannot be held liable for his statements and actions at that time.  Assuming that Edwards still was employed by defendant, however, the analysis then turns to the issues of whether Edwards's statements and actions were committed in furtherance of defendant's business, whether they were within the line and scope of his employment, or whether defendant participated in, authorized, or ratified the allegedly tortious acts.

The acts of an employee are committed in furtherance of the business of his

employer when the employer derives a benefit from the acts of the employee, or when the acts of the employee serve a purpose of the employer. *See Ex parte Atmore*, 719 So. 2d at 1194   The acts of an employee are not committed in furtherance of the business of his employer, however,  when the "alleged conduct was aimed solely at satisfying [the employee's] own . . . desires." *Id.* (bracketed alteration supplied). Here, plaintiff neither argues, nor presents evidence showing, that the conspiratorial scheme allegedly concocted by Edwards and Ordonez either furthered, or served a purpose of, defendant's business.

"An employee's tortious acts occur within the scope of his employment if the acts are 'so closely connected with what the servant is employed to do and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.'" *Id*. (quoting Prosser & Keeton, *The Law of Torts* 503 (5th ed. 1984)).  Here, the conversation did not occur within any of defendant's restaurants, and there is no evidence that it occurred during hours normally worked by Edwards for defendant. *See Land v. Shaffer Trucking, Inc.*, 275 So. 2d 671, 674 (Ala. 1973) ("Where the servant abandons his master's business for personal reasons, the employment is suspended, and the master is not liable for the negligence of the servant during the suspended employment, and during the time of the servant's departure from the master's

business.") (citing *Engel v. Davis*, 57 So. 2d 76 (1952)). Furthermore, defendant employed Edwards to manage a restaurant, and spreading falsehoods about an employee of his restaurant did nothing to serve that objective.

"An employer ratifies conduct if:  (1) the employer has actual knowledge of the tortious conduct; (2) based on this knowledge, the employer knew the conduct constituted a tort; and (3) the employer failed to take adequate steps to remedy the situation." *Ex parte Atmore Community Hospital*, 719 So. 2d at 1195.  Here, there is no evidence that any of Edwards's supervisors knew of the conversation he allegedly had with Ordonez at any time prior to this litigation.  Because plaintiff fails to present evidence that the alleged tortious conduct occurred in furtherance of defendant's business, within the scope of Edwards employment, or that defendant ratified the conduct, she cannot establish that defendant is liable for the alleged defamation or invasion of privacy committed by Edwards, and summary judgment is due to be granted on her defamation and invasion of privacy claims.

### 3.    Negligent hiring, training, supervision, and retention

In *Big B, Inc. v. Cottingham*, 634 So. 2d 999 (Ala. 1993), the Alabama Supreme Court recognized a cause of action for negligent or wanton hiring, training, retention, and supervision, and held that an employer (a "master"), is liable for the "incompetency" of his employee (a "servant") when

notice or knowledge, either actual or presumed, of such unfitness has been brought to him.  Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence.  This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care must have had them brought to his notice. While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care.

*Id*. at 1003 (quoting *Thompson v. Havard*, 235 So. 2d 853, 858 (Ala. 1970)).

However, not just any "incompetency" suffices to give rise to a cause of action for so-called "negligent hiring, training, retention, and supervision liability."  Rather, there must be an underlying common law tort recognized by Alabama courts:  *that is*, in order to prevail, the plaintiff must prove that the allegedly incompetent employee committed a tortious act.  *See Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999) (affirming summary judgment on a negligent supervision and training claim for lack of an underlying tort).

Plaintiff's claim is based upon the assertion that defendant "negligently failed to discipline or terminate those employees who actively harassed and conspired

against Andazola," failed to administer its policies against sexual harassment, failed to properly train its employees concerning harassment, and failed to protect plaintiff from harassment.[134]   Under Alabama law, an independent cause of action for sexual harassment does not exist and, thus, the alleged sexual harassment alone cannot be the underlying tort necessary for plaintiff's negligent hiring, training, supervision, and retention claim.  *Id.* at 824-25.

However, the Alabama Supreme Court has recognized a sexual harassment exception to the requirement that a common law tort must underlie a negligent hiring, training, supervision, and retention claim.  The exception provides that "the manner in which a sexual-harassment complaint is handled when sexual harassment has, in fact, occurred c[an] form the basis for a claim for negligent or wanton supervision" when the handling of the complaint did not cause the harassment to cease or caused

---

[134] Doc. no. 1 (Complaint) ¶¶ 51-57.  To the extent that plaintiff's pleadings and briefs could be construed as asserting that the alleged defamation or false light invasion of privacy discussed above are underlying torts creating negligent hiring, training, retention, and supervision liability, that claim would fail as a matter of law.  Even assuming that Edwards committed the torts of defamation and false light invasion of privacy while employed by defendant, to hold defendant liable under a negligent hiring, retention, training, or supervision cause of action plaintiff must show that defendant either knew, or that if defendant had "exercised due and proper diligence" it would have known, of this incompetency.  *Big B, Inc.*, 634 So. 2d at 1003.  In other words, plaintiff must show that defendant had reason to know that Edwards was prone to defamation or false light invasion of privacy.  *Id.*  Plaintiff fails to make this showing.  Rather, there is no evidence to show that defendant knew Edwards was going to publicly make false statements, or that Edwards had ever made such statements before.  Furthermore, there is no evidence of record to show that defendant had any reason to know that Edwards made the alleged statements at Sidelines until after this litigation commenced.

it to only temporarily cease.  *Id.* at 825 (bracketed alteration supplied); *see also*

*Patterson v. Augat Wiring Systems, Inc.*, 944 F. Supp. 1509, 1528-29 (M.D. Ala.

1996); *Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981, 986-88 (Ala.

1999); *Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889-90 (Ala. 1995)

(holding that for purposes of the defendant employer's motion for summary

judgment, the existence of a genuine issue of material fact regarding whether the

employer had failed to take adequate corrective action in investigating a complaint

of sexual harassment precluded the entry of summary judgment on the employee's

claims of negligent supervision and training); *Big B, Inc.*, 634 So. 2d at 1003-04.  A

plaintiff cannot make out a claim based on the handling of a sexual harassment

complaint unless the plaintiff can prove that the underlying sexual harassment

occurred.  *Stevenson*, 762 So. 2d at 825.

Here, plaintiff has presented evidence to show that she was sexually harassed

by Austin and Moody.  She also presents evidence to show that she complained about

the sexual harassment to Rodriguez and Edwards on multiple occasions.  She presents

evidence that the only actions defendant took to remedy the harassing behavior by

Moody was that Edwards spoke to Moody, and no action was taken to remedy the

harassing behavior by Austin despite her repeated complaints.  Finally, she presents

evidence that the harassment perpetrated by Moody and Austin was ongoing

throughout her employment despite her complaints and defendant's actions.  Based on these facts, plaintiff establishes a claim for negligent hiring, training, retention, and supervision based on the handling of her sexual harassment complaints, and summary judgment is due to be denied on this claim.

## IV. CONCLUSION AND ORDER

Upon consideration of the foregoing issues, defendant's motion for summary judgment is GRANTED IN PART AND DENIED IN PART.  Summary judgment is granted on all claims except plaintiff's Title VII disparate treatment claim for denial of her application for promotion to the position of General Manager of the Athens, Alabama "Roadhouse" (the one awarded to Nykael Stewart), and, her state-law "negligent hiring, training, retention, and supervision claim."  A pretrial conference and trial date will be set by separate order.

**DONE** and **ORDERED** this 10th day of April, 2012.